Submission

Regarding Continuing Violations By

HSBC Bank USA, N.A.
HSBC North America Holdings, Inc., and
HSBC Holdings plc

of

The Bank Secrecy Act of 1970
The Trading with the Enemy Act, and
The International Emergency Economic Powers Act

Submitted By: Everett A. Stern

March 11, 2013

Sherrie R. Savett
Russell D. Paul
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103
Tel: (215) 875-3000

Lawrence Walner
Aaron Ross Walner
THE WALNER LAW FIRM
20 North Clark Street, Suite 2450
Chicago, Illinois 60602
Tel: (312) 201-1616

**TABLE OF CONTENTS**

OVERVIEW ........................................................................................................................ 3
FACTUAL BACKGROUND ............................................................................................ 4
   I.     DEFENDANTS .................................................................................................... 4
   II.    COMPLAINANT EVERETT A. STERN ............................................................ 4
HSBC'S ILLEGAL CONDUCT ........................................................................................ 5
   I.     SINCE 2010, HSBC HAS CONTINUED ITS ILLEGAL MONEY LAUNDERING ACTIVITIES ....................................................................................................................... 5
   II.    HSBC DELIBERATELY CREATED A CULTURE AND SCHEME OF EVADING AML LAWS, WHICH CONTINUES TO THE PRESENT ............................................... 9
   III.   HSBC AML DEPARTMENT MANAGEMENT RIGGED THE SYSTEM TO EFFECTUATE ITS UNLAWFUL SCHEME TO EVADE AML LAWS AND REGULATIONS IN ORDER TO BOOST ITS PROFITS ............................................. 12
THE DECEMBER 11, 2012 SETTLEMENTS DO NOT RELEASE HSBC FROM LIABILITY ...................................................................................................................... 13
   I.     The Terms of the December 11, 2012 Settlement ............................................. 13
   II.    Under the December 11, 2012 Settlement Agreements, HSBC Remains Liable ............. 14

## **OVERVIEW**

Complainant Everett A. Stern, while employed in the Anti-Money Laundering (AML) Division of HSBC Bank USA in 2010 and 2011, discovered that HSBC was engaged in conduct that violated the Bank Secrecy Act of 1970, the Trading with the Enemy Act (TWEA), and the International Emergency Economic Powers Act, despite having agreed, pursuant to a Cease and Desist Order it had signed in October 2010, to cease and prevent any recurrence of all such illegal conduct.  Stern discovered specific illegal acts of money laundering activity, concerted efforts designed to dupe the government into believing that HSBC was in compliance with the 2010 Cease and Desist Order and federal anti-money laundering laws and regulations when it was not, rules and incentives that created a general corporate culture that elevated bank profits from suspicious money laundering activity over compliance with the law, internal mechanisms designed to sweep potentially illegal money laundering activity under the rug before it could be properly investigated and reported to authorities, and the presence of gross conflicts of interest.  The illegal conduct resulted in HSBC's blatant participation in, and enabling of, drug trafficking, terrorist activities and the channeling of money to sanctioned regimes abroad.  Stern reported his findings to his superiors at HSBC and was at various times ignored, taunted, ridiculed and ultimately forced out.  Stern also reported this information to the CIA and the FBI.

Although HSBC entered into five Settlement Agreements with five different U.S. government agencies on December 11, 2012 pursuant to which HSBC agreed to pay $1.92 billion in fines and penalties, those Settlement Agreements do not release the specific illegal conduct Stern complains of and reports herein, and pertain generally to conduct that occurred prior to Stern's employment with HSBC.

Startlingly, those Settlement Agreements cite HSBC's cooperation and remediation efforts as the basis for leniency in the terms imposed.  Complainant's discoveries of continued intentional illegal conduct, detailed below, demonstrate the extent to which those five government agencies were duped by HSBC.  It is also worth noting that the fines and penalties imposed on HSBC represent a mere four weeks of profits for this banking behemoth.[1]

The U.S. Senate Permanent Subcommittee on Investigations held a hearing on July 13, 2012) regarding HSBC's conduct and issued a HSBC Case History Report on July 17, 2012).  Although HSBC executives met with the Subcommittee prior to the hearing to make the case that it had implemented strong reforms since receiving the 2010 Cease and Desist Order, Stern uncovered evidence that some of these reforms were entirely bogus and, indeed, only worked to allow HSBC to increase its illegal conduct and its profits derived therefrom.

---

[1] "[T]he sum represents about four weeks' earnings given the bank's pre-tax profits of $21.9bn last year." http://www.guardian.co.uk/business/nils-pratley-on-finance/2012/dec/11/hsbc-money-laundering-fine

3

**FACTUAL BACKGROUND**

I.   **Defendants**

HSBC Bank USA, N.A. is a federally chartered banking institution and subsidiary of HSBC North America Holdings, Inc. with its principal place of business at 452 Fifth Avenue, New York, NY 10018.

HSBC Holdings plc is a financial institution holding company organized under the laws of England and Wales (collectively with HSBC Bank USA, "HSBC" or the "bank") with its U.S. headquarters at 452 Fifth Avenue, New York, NY 10018.

Stuart Thomson Gulliver is Group Chief Executive of HSBC Holdings plc. He is also Chairman of The Hong Kong and Shanghai Banking Corporation Limited, a position he has held since January 2011.

The Anti-Money Laundering (AML) Division of HSBC Bank USA was managed by the following personnel, notable for their lack of experience and expertise in discovering and preventing money laundering:

- Gary Peterson is Senior Executive Vice President/Chief Compliance Officer of HSBC Bank USA.

- Mike Troccia, a former FBI counterintelligence officer, was the Director of Compliance until his employment was terminated for cause in April 2011. He was replaced by Adam Fates, formerly with HSBC Card Services Division, who had no previous AML experience.

- Jeff Kraft was a Senior Vice President and Assistant Director in the AML Division until July 2012.

- Kristen Gaken started out as a temporary hire just out of law school and was promoted four times in eight months to become Senior Vice President of the AML Division.

- Stephanie Napier, who was a manager in the collections department for close to 30 years, was made Senior Vice President of Financial Intelligence in the AML Division. She was the head of Target Monitoring and managed the Wire Filter System.

II.   **Complainant Everett A. Stern**

Complainant Stern earned an MBA in Finance from Stetson University in May 2010, with studies in Finance, Risk Management, Statistical Data Analysis and Applied Research. Prior to that, he earned a BA in Liberal Arts from Florida Atlantic University in May 2008, concentrating on Middle Eastern Studies, Economics, Statistics, Political Economy and Foreign Policy.

Complainant Stern was employed as an Anti-Money Laundering Officer at HSBC from October 2010 through October 2011. On September 26, 2011, Stern took a medical leave of

4

absence from HSBC due to discrimination, harassment and retaliation, having been subjected to a number of anti-Semitic comments and having been twice demoted for reporting illegal money laundering activity to his superiors at HSBC. Stern was first demoted in February 2011 to the Alert Team and then demoted again in June 2011 to the Low Risk Alert Team. In November 2011, Stern entered into a Separation Agreement and Release with HSBC, settling his retaliation and discrimination employment claims against HSBC.

## HSBC'S ILLEGAL CONDUCT

In December 2012, HSBC entered into five separate settlement agreements with five different federal agencies, agreeing to fines and penalties of almost $2 billion in exchange for a Deferred Prosecution Agreement from the Department of Justice.[2] Although these agreements were finalized and announced in December 2012, virtually all of the conduct identified in them was from 2010 and before. Those agreements described HSBC's ostensibly extensive remediation and compliance efforts between the October 2010 Cease and Desist Order and the December 2012 settlement agreements. HSBC signed those agreements describing their remediation and compliance procedures when they knew those procedures were merely window dressing and a sham to cover up its continuing violations of U.S. anti-money laundering law and lack of an effective compliance protocol.

**I.     Since 2010, HSBC Has Continued Its Illegal Money Laundering Activities**

On October 6, 2010, HSBC Bank USA entered into a consent cease and desist order with the Office of the Comptroller of the Currency (attached hereto as Exhibit 1), which required the bank to take comprehensive corrective actions to improve its BSA compliance program. On October 4, 2010, HSBC North America (the indirect parent of HSBC Bank USA) entered into a consent cease and desist order with the Federal Reserve Board (attached hereto as Exhibit 2) to ensure the adequacy of the parent company's firm-wide compliance risk-management program (together, the "Cease and Desist Orders"). The Cease and Desist Orders followed extensive government investigations that found that HSBC had engaged in systematic and widespread violations of U.S. anti-money laundering laws.

Complainant Stern was hired as part of HSBC's effort to comply with these two Cease and Desist Orders, and began working as an Anti-Money Laundering (AML) Officer at HSBC on October 18, 2010. He was appointed to the Target Monitoring Team and the High Risk Alert Team, where his duties included investigating suspicious banking activity as part of HSBC's Anti-Money Laundering Program and investigating bank customers to ensure they did not do business with certain excluded countries. He was named as the department specialist on Middle Eastern transactions.

When Stern started at HSBC in October of 2010, there were approximately 15-20 compliance officers. At the time of his departure in November of 2012, there were approximately 300 AML compliance officers. However, these new compliance officers were woefully

---

[2] These five different federal agencies are the U.S. Department of Justice, the Office of the Comptroller of the Currency (OCC), the Federal Reserve, the U.S. Department of Treasury's Office of Foreign Assets Control (OFAC), and the Financial Crimes Enforcement Network (FinCEN).

inadequate and unqualified to fulfill their duties. To fill the cubicles in its AML compliance program and to dupe the federal government into believing it was complying with the October 2010 Cease and Desist Orders, HSBC sold its credit card division to Capital One, freed up hundreds of debt collectors and customer service agents from its New Castle, DE call center who had no finance or AML experience and generally only a high school diploma, and hired 300 of them to work as AML compliance officers. HSBC paid these former debt collectors and customer-service agents as much as $55,000 per year, and as a result, retained an enormous amount of leverage over them and their work product.

HSBC maintained a computer system infrastructure called CAMP ("Customer Account Monitoring Program") which stored all of the bank's transactions, including all wire transfers of money on behalf of all of its own banking customers and customers of its correspondent banks.[3] A separate computer program, called the Alert Monitoring System, monitored CAMP and sent out an Alert, which notified AML Compliance Officers of suspicious activity regarding a transaction, such as a bank customer sending numerous small dollar wire transfers to multiple beneficiaries in countries designated by the U.S. Department of Treasury's Office of Foreign Assets Control (OFAC) as subject to sanctions (*e.g.*, Iran, Cuba, Sudan, Libya and Burma). The Alert Monitoring System was replaced in the spring of 2011 by a new program called Norcom, which similarly triggered Alerts.

There were three possible dispositions of an Alert. The first was that an AML Compliance Officer would review an Alert and clear it, which would close any inquiry into the underlying transaction that gave rise to the Alert. To close an Alert, the investigator was required to write a narrative that identified some factual information about the entity and/or transaction in question that mitigated any risk posed by that Alert. As discussed below, HSBC used tremendous pressure and offered incentives for AML Officers to close as many Alerts as quickly as possible, to ensure the bank's profits from the underlying transactions. The second disposition was that the Alert would be escalated to a Suspicious Activity Report (SAR), which was sent to Director of Compliance Mike Troccia and to the Treasury Department. Before such escalation occurred, a Request for Information (RFI) would be sent to the correspondent bank for more information about the transaction. The third disposition was that the Alert would be placed "on watch." This meant that the Alert was not suspicious enough to be escalated to a SAR, but sufficiently suspicious such that the next time an Alert was generated that referenced the same entity, the investigator would be notified that there was a prior suspicious alert.

OFAC maintained a list of regimes, terrorists, international narcotics traffickers, and persons engaged in activities related to the proliferation of weapons of mass destruction. HSBC installed a Wire Filter System that contained all of the names on the OFAC list and was intended to halt any wire transfers or any other flow of funds to or from any OFAC listed person or entity.

---

[3] Correspondent banks receive deposits from, make payments on behalf of, or handle other financial transactions for foreign financial institutions. In essence, correspondent banking involves the facilitation of wire transfers between foreign financial institutions and their customers, and other financial institutions with which the foreign financial institution does not have a direct relationship. Correspondent accounts are generally considered high risk because the U.S. bank does not have a direct relationship with, and therefore has done no due diligence on the foreign financial institution's customers who initiated the wire transfers. To mitigate this risk, the Bank Secrecy Act requires financial institutions to conduct due diligence on all non-U.S. entities (i.e., the foreign financial).

Entities that were the subject of HSBC Suspicious Activity Reports (SARs) were also entered into HSBC's Wire Filter System.

During the course of his employment, Stern discovered the following HSBC illegal activities, which he promptly reported to both HSBC senior management and U.S. government officials:

- In November 2010, Stern discovered that Crossbar FX Ltd., a Money Servicing Business (MSB) based in the UK, was sending large amounts of money (through low dollar amount transaction under the $10,000 trigger) through HSBC to numerous individuals and entities in the Middle East and China. Crossbar FX claimed on its website to have a banking relationship with HSBC. To confirm his findings, Stern pretended to be an importer/exporter and phoned Crossbar FX. He spoke with a man named Ben Stevens, who identified himself as the owner and stated that Cross Bar was a one man operation that exchanged currency and that could provide lower exchange rates than banks. Stern searched the HSBC CAMP system and found that Crossbar had used coding on its wire transfers designed to evade HSBC's Alert Monitoring System and had funneled over $40 million through HSBC to other MSBs in China and the Middle East. This is against AML regulations, which require the bank to know exactly who both the originator and beneficiary of a wire transfer is. Having a MSB on either end of a wire transfer is the paradigm of a classic money laundering scheme because it hides the true identities of both the originator and the beneficiary. Stern immediately reported this to his superiors Stephanie Napier, Jeff Kraft, Mike Troccia, and Kristen Gaken. In addition, on November 7, 2010, Stern sent an email from his personal email account to CIA recruiter Craig P. to report this discovery. (Attached as Exhibit 3)

- In December 2010, Stern discovered that a Canadian shipping company was sending suspicious wires through HSBC to other shipping companies. Every bank client has a KYC (Know Your Customer) form on file at the bank. It contains summary information about the client, including a description, location information, ownership, contact information, etc. It was Stern's job to investigate both transactions and customers for any suspicious activities or ties. If Stern thought there was an issue with a bank client, he was to review the KYC and determine whether a SAR on that client should be filed. As part of his investigation of the KYC of this Canadian shipping company, Stern telephoned the shipping company and pretended to be an importer/exporter trying to get bullets into Iran, and explained that due to OFAC regulations he could not do so. The company offered to help and to have someone waiting at the airport in Tehran to unload the cargo and see that it gets to its proper destination in Iran. This was a violation of AML laws and regulations – the bank could not have a client that did business or otherwise had any ties to any OFAC-listed country, including Iran. Stern wanted to draft a SAR, which would have been sent to the Treasury Department, and immediately notified his superiors Stephanie Napier, Jeff Kraft and Mike Troccia of these facts. Jeff Kraft made light of this infraction and said to Stern at Stern's desk, "You pulled me away from my work for this?" All of the Canadian shipping company's bank transactions were subsequently approved. Stern promptly reported this information to the CIA through the CIA on line Tip Portal at www.CIA.gov.

- In January 2011, Stern discovered that HSBC was allowing hundreds of millions of dollars in terrorist funds to move through HSBC and Standard Chartered Bank (a correspondent bank of HSBC) from Africa to Beirut, Lebanon.  The money was originating from Kairiba Supermarkets and Shopping Centres (an OFAC-listed sanctioned company) in Gambia and going to Tajco, a company based in Beirut (also an OFAC-listed sanctioned company) that owns a majority interest in Kairaba.  Tajco is run by the Tajideen Brothers, OFAC-listed persons who the U.S. State Department has determined are terrorists and the financiers of Hezbollah.[4]  Although Kairaba and Tajco had been entered into the Wire Filter System, those names had been misspelled.  Because the Wire Filter only reads exact names and does not pick up misspellings or any slight variation in the name, these illegal money transfers were allowed to go through.  Stern immediately notified management of this problem, but no corrections were made in the Wire Filter.  Thus, Hezbollah was allowed to continue to launder money through HSBC.  Stern believes that this illegal activity still continues to this day.  Stern promptly reported this information to the CIA through the CIA on line Tip Portal at www.CIA.gov.

- In March 2011, Stern discovered that Sharbatly Fruit, a Saudi Arabian fruit distribution company banking with SABB (a correspondent bank of HSBC formerly known as The Saudi British Bank), was sending millions of dollars to an individual in Yemen.  Stern researched the individual and found that he was a leading party member of the Yemini Party of Reform, frequently called Islah or Al-Islah, which is the main opposition party in Yemen that was created in September 1990 by Yemeni members of the Muslim Brotherhood.  Because Saudi Arabia was labeled a high risk country by HSBC and because the funds were going to a Yemeni political person (in industry parlance, known as a PEP, or "Politically Exposed Person"), this was a highly suspicious activity that should have risen to the level of a SAR.  Stern outlined his concerns in a written Alert narrative requesting that it be elevated to a SAR and attached all supporting documentation, including articles from the Brookings Institute and other academic articles proving the link to the Muslim Brotherhood.  Stern was scolded for using the words "possible terrorist financing" and "suspicious activity" in his report.  His request for a SAR was denied by Kristen Gaken and all of Sharbatly Fruit's transactions were approved.  Stern promptly reported this information to the CIA through the CIA on line Tip Portal at www.CIA.gov.

- In June of 2011, as the specialist on the Middle East, Stern discovered that a number of the former HSBC debt collectors who were appointed AML Compliance Officers were approving transactions going to foundations in the Gaza Strip.  Stern reported this to his superiors, and warned that Hamas, which the U.S. State Department has deemed a terrorist organization, is the elected government of Gaza and that this money could be used to fund terrorism.  He did so by sending an email titled "Compliance Error" to Jeff Kraft and Luis Viteri (attached as Exhibit 4).  Subsequently, Jeff Kraft pulled Stern into a conference room

---

[4] "The US Treasury Department's Office of Foreign Assets Control has blacklisted Hezbollah fundraisers Ali Tajideen and Husayn Tajideen, claiming they provided support to the Islamist terrorist group. These men are the brothers and business partners of Kassim Tajideen, who was previously designated by OFAC for financing Hezbollah. OFAC's latest action also targeted a network of businesses owned or controlled by the Tajideen brothers in Gambia, Lebanon, Sierra Leone, the Democratic Republic of Congo, Angola, and the British Virgin Islands."
http://www.complinet.com/global/news/news/article.html?ref=139160

and threatened to fire him. Kraft stated, "Do you know what would happen if the government found out about the Compliance Error email. They would shut us down. Do you fucking understand we are under a cease and desist order and you are putting in writing that we have a compliance error!? Gary Peterson would fire you in two seconds if he found out about this." When Stern tried to explain the situation to Kraft, Kraft stated, "Hamas is not a terrorist organization - they were elected to power." Stern reminded Kraft that even though Hamas was elected, it was still considered a terrorist organization by the U.S. government and was on the OFAC list. Nothing was done and all wires into Gaza were approved. Stern promptly reported this information to the CIA through the CIA on line Tip Portal at www.CIA.gov.

Currently, HSBC Senior Vice President Jeff Kraft, under orders from Chief Compliance Officer Gary Peterson, is now setting up operations in Sri Lanka for AML Investigations to be conducted overseas by foreign nationals. This is highly improper as HSBC itself rates Sri Lanka as a high-risk country for money laundering. It leaves HSBC's AML functions open to being infiltrated, improperly influenced and exploited by corrupt local employees.

Recently, Stern was told by a senior member of the HSBC AML compliance program team that in the summer of 2012 and as a favor to HSBC Hong Kong, Senior Vice President of Financial Intelligence Stephanie Napier altered the Wire Filter System to remove certain OFAC-listed entities, which allowed millions of dollars of wire transactions initiated by HSBC Hong Kong to go through. These were transactions that had previously been held up by the Wire Filter System because the money was either going to or coming from an OFAC-listed entity. Napier sent an internal HSBC email to AML staff outlining her actions.

## II. HSBC Deliberately Created a Culture and Scheme of Evading AML Laws, which Continues to the Present

HSBC created a culture of evading AML rules and regulations among its AML compliance program investigators by encouraging, motivating and rewarding those investigators to close as many Alerts as possible (and thus ensure the bank's profits), regardless of the circumstances and red flags present in the transaction. Investigators were specifically pushed not to identify and eliminate transactions with suspicious activity, because eliminating such transactions would decrease bank profits. The goal was to close the Alerts and green-light the underlying transactions and avoid elevating the Alert to a Suspicious Activity Report (SAR). Although federal regulations are designed to reduce illegal money laundering and prohibit such financing transactions, the bank that is charged with ferreting out and voiding these transactions makes more money if those transactions slide through the bank undetected. Rather than honor its regulatory obligations to detect and eliminate illegal transactions, HSBC erected a facade of compliance efforts while encouraging its compliance personnel to actually approve the illegal transactions. HSBC created this culture in the following way.

- An investigator who closed more alerts earned public recognition from senior management (specifically Mike Troccia and Jeff Kraft). Kraft, on a daily basis, would send out emails with lists and ranks of which investigators were closing the most Alerts (attached hereto as Exhibit 5). Kraft would also have a "floor meeting" in the middle of the cubicles announcing

9

the winners of the week. Mike Troccia would stand on investigator's desks to address the room and announce the winning investigators.

- An investigator who consistently closed a high volume alerts was considered for promotion. The Organization/∆ Time Table attached as Exhibit 6 shows in just a small cross-section of the organization, the numerous promotions in a short time span. Investigators wanted to be considered for a promotion, which meant they spent less time on investigating and more time simply closing Alerts.

- Mike Troccia routinely took investigators out to lunch when he visited from New York to reward those who had closed a large number of high-level alerts.

- AML team management set minimum Alert clearing goals to keep production high. During the summer of 2011, management set the weekly minimum of Alert clearings at 72 Alerts per week per investigator. The investigators were flabbergasted by this announcement and openly protested, saying it could not be done. Jeff Kraft replied, "Find a way." Indeed, Stern was specifically told by Senior Vice President Kristen Gaken, "You have to find a way to mitigate risk - you have to find a way." Gaken was instructing Stern to find anything that he could use to show that the risk of a transaction being related to money laundering was mitigated such that the corresponding Alert could be closed.

- Management offered financial rewards in an attempt to close more Alerts. Jeff Kraft and HSBC Senior Vice President/COO Jennifer Strybel presented each AML employee with an optional contract which, if signed, obligated investigators to work longer hours and close more Alerts in return for a salary increase. An investigator received an additional 25% of base salary if he agreed to work 55 hours per week. Stern signed this contract. In all instances, the emphasis was simply on the number of alerts that were closed, not the quality of the investigation.

- Management loosened the criteria to clear an Alert when a backlog of Alerts developed, and later reversed course when the backlog subsided. This occurred in February 2011 when Troccia sent an email to all the investigators stating that transactions through The Saudi British Bank could be closed or closed on watch without sending a RFI to Saudi British Bank to get more information because Saudi British Bank could be trusted. Any Alert related to Saudi British Bank was automatically cleared, despite the fact that Saudi Arabia was labeled by HSBC as a high risk country. The same thing happened with HSBC Hong Kong in June 2011.

- Management determined and informed the investigators that no investigations were needed for bank-to-bank transfers. As such, Alerts based on such transfers could be automatically closed. Investigators routinely sought out these Alerts to examine because they were the easiest to close. This is a gross violation of AML rules. Just because transfers are from one bank to another does not mean that money isn't being laundered or funneled to terrorist organizations or OFAC-listed entities. Not all foreign banks can be trusted.

- Quality Assurance (QA) was minimal and defective. The QA teams did not exist until March of 2011, and once in effect, did not properly check the quality of investigations. The QA analysts did not thoroughly examine investigations as they were supposed to, but simply made sure all of the required paperwork was attached. For example, an investigation submitted on Norcom (the internal HSBC computer program that replaced The Alert Monitoring System in the spring of 2011) needed to have a narrative of why the risk posed by that transaction was mitigated and a PDF of the website of the entity in question. QA did not look at the PDF to ensure it was related to the entity in question. QA merely looked at the PDF to make sure it was attached. The investigator could (and frequently did) take a PDF of the website of an unrelated entity and attach it to the investigation, and QA would (and did) approve the transaction.

  Furthermore, QA made their guidelines more lenient when there were large backlogs of Alerts. For example, QA initially required that both the originator and beneficiary of a suspicious money transfer that was the subject of an Alert be properly vetted before an Alert could be cleared. When there was a backlog of Alerts to be cleared, QA only required due diligence on the focal entity. Thus, if an entity was transferring money through HSBC to five different companies, only the entity had to be examined and not the other five corporations.

  In addition, QA changed the sample size from investigator to investigator. If a QA chose a sample of two from an investigator who performed 10 investigations and determined that one of those two investigations was defective, that investigator would receive an error rating of 10% (one defective out of 10). This would motivate the investigator to perform more investigations quickly so that his error rating would drop. If he performed 40 more, then his error rating became one out of 50, or 2%.

  Also, QA made their examination criteria known to the investigators, allowing the investigators to do the absolute bare minimum when clearing an Alert that was required for the Alert to pass muster with QA, which was far less than a complete investigation. QA made their examination criteria known to the investigators at numerous meetings with investigation teams and by posting signs on investigators' computers outlining QA rules. This negated the QA function altogether by allowing investigators to craft their paperwork so as to avoid problems with QA.

- Norcom, which went live at HSBC in April 2011, replaced the Alert Monitoring System. Norcom was put in place after a backlog of Alerts developed because it allowed for the bulk closings of blocks of Alerts that were generated against the same focal entity. Teams in the United States and India comprised of untrained employees worked on closing assigned blocks of Alerts, and often did so indiscriminately and incorrectly.

- SARs were written by unqualified people and were submitted beyond their deadlines. Prior to June 2011, the investigator who discovered suspicious activity had to be the one to write up a SAR on the transaction. In June 2011 a team was created to only write SARs, in an effort to increase productivity. The SAR team was comprised of incompetent personnel who did not have a thorough understanding of the underlying suspicious activity and were merely an effort to close the tremendous backlog of Alerts by freeing up the other investigators.

11

- Management closed alerts before they were investigated sufficiently and reopened them later, which would start the clock back at zero and allow an additional thirty days for the investigation. As a result, HSBC would be submitting false reports of closed Alerts to the Treasury Department.

- RFIs (Requests for Information) were not handled properly. The RFI procedures were vague. There was no standardization of how RFIs should be prepared, and there was no monitoring of RFIs, either before they went out or after they were returned. Also, there was no verification of the information disclosed on a returned RFI.

### III. HSBC AML Department Management Rigged the System to Effectuate Its Unlawful Scheme to Evade AML Laws and Regulations in order to Boost Its Profits

Since 2010, the managers of AML Department deliberately employed tactics to rig HSBC's AML compliance program to evade AML laws and clear Alerts without the due diligence required by both federal law and the 2010 Cease and Desist Order. These tactics included the following:

- Troccia allowed investigators to automatically close Alerts generated by bank-to-bank transfers. In fact, Troccia drafted the actual language for the narrative that an investigator was to complete after examining such a bank-to-bank Alert and emailed the wording to all of the investigators. This made bank-to-bank transaction Alerts the easiest to close, because no investigation was now required.

- Director of AML Compliance Gary Peterson also runs IMAG Consulting Services, which has a contract with HSBC to provide personnel to handle QA of Alerts and to investigate Alerts. IMAG is substantially owned by Peterson's wife. IMAG consultants earn $500.00/hour while working for HSBC. Thus, Peterson is conflicted in his role as Director of AML Compliance and the IMAG consultants at HSBC are not independent and not motivated to objectively analyze HSBC's AML work product.

- Troccia ordered all the investigators to use Lexis/Nexis to gather information for their investigative narratives without any training on Lexis/Nexis. In addition, Troccia provided the investigators with standardized legal language to paste into their narratives, which allowed for a cookie-cutter approach to quickly close more Alerts. Troccia then misrepresented to the Treasury Department that independent investigations were being performed on Alerts pursuant to research on Lexis/Nexis.

- Mike Troccia submitted Suspicious Activity Reports (SARs) to the Treasury Department under his signature that he did not write. A SAR was written by an AML investigator and then sent to Kristen Gaken, who then reviewed it and signed the SAR with Troccia's signature before submitting it to the Treasury Department.

- Unqualified personnel were quickly promoted up the AML Department ranks. For example, Kristen Gaken began working at HSBC as a temporary independent contractor in the summer

12

of 2010. She started around the same time as Mike Troccia, and was very close to him. Mike Troccia promoted Kristen from Temporary Employee to Full Time Employee to Team Leader to Assistant Vice President and then to Senior Vice President - all within an (8) month duration. In addition, Stephanie Napier, who spent most of her 30 year career at HSBC in collections and card services and who held no formal higher education beyond a paralegal degree, was made Senior Vice President of Financial Intelligence.

## THE DECEMBER 11, 2012 SETTLEMENTS
## DO NOT RELEASE HSBC FROM LIABILITY

**I.**   **The Terms of the December 11, 2012 Settlement**

On December 11, 2012, HSBC entered into a deferred prosecution agreement ("DPA")[5] pursuant to which the Department of Justice filed a four-count Criminal Information in the United States District Court for the Eastern District of New York and agreed to defer prosecution, and HSBC agreed, among other things, to pay $1.92 billion fines and penalties.[6] The Criminal Information charged the HSBC Parties with the following illegal activity:

> (a) willfully failing to maintain an effective anti-money laundering program, in violation of The Bank Secrecy Act of 1970 (BSA), Title 31, United States Code, section 5318(h) and regulations issued thereunder;

> (b) wilfully failing to conduct and maintain due diligence on correspondent bank accounts held on behalf of foreign persons, in violation of the BSA, Title 31, United States Code, Section 5318(i) and regulations issued thereunder;

> (c) wilfully violating and attempting to violate the Trading with the Enemy Act (TWEA), Title 50 United States Code Appendix Sections 3,5,16, and regulations issued thereunder; and

> (d) wilfully violating and attempting to violate the International Emergency Economic Powers Act (IEEPA), Title 50 United States Code Sections 1702 and 1705, and regulations issued thereunder.

> The HSBC Group violated IEEPA and TWEA by illegally conducting transactions on behalf of customers in Cuba, Iran, Libya, Sudan and Burma – all countries that were subject to sanctions enforced by the Office of Foreign Assets Control (OFAC) at the time of the transactions.

---

[5] The DPA is currently pending court approval in the United States District Court for the Eastern District of New York.

[6] This includes $1.256 billion in forfeiture to the Department of Justice, $500 million to the Office of the Comptroller of the Currency (OCC), $165 million to the Federal Reserve, and a $375 million settlement with the U.S. Department of Treasury's Office of Foreign Assets Control (OFAC) (which is satisfied by the forfeiture to the Department of Justice). The OCC penalty also satisfies a $500 million civil penalty of the Financial Crimes Enforcement Network (FinCEN).

13

HSBC's illegal acts, as set forth in the Statement of Facts attached to the DPA, include:

(1) lack of an effective anti-money laundering (AML) function in 2006 through 2010 that facilitated the laundering of at least $881 million in drug proceeds through the U.S. financial system;

(2) failure to adequately monitor over $200 trillion in wire transfers between 2006 and 2009 from customers located in countries that HSBC Bank USA classified as "standard" or "medium" risk;

(3) from the mid-1990s through September 2006, allowing approximately $660 million in OFAC-prohibited transactions to move through the U.S. financial system on behalf of banks located in Cuba, Iran, Libya, Sudan, and Burma, in violation of U.S. economic sanctions; and

(4) from 2006 to 2010, severely understaffing its AML compliance function and failing to implement an anti-money laundering program capable of adequately monitoring suspicious transactions and activities from HSBC Group Affilliates, particularly HSBC Mexico. This included a failure to monitor billions of dollars in purchases of physical U.S. dollars, or "banknotes," from these affiliates.

In conjunction with the DPA, each of the following U.S. government agencies entered into its own Settlement Agreement (collectively, the "Settlements") with HSBC on December 11, 2012:[7]

- Board of Governors of the U.S. Federal Reserve System,
- U.S. Department of Treasury's Office of Foreign Assets Control (OFAC),
- Office of the Comptroller of the Currency (OCC), and
- Financial Crimes Enforcement Network (FinCEN) of the Treasury Department

## II. Under the December 11, 2012 Settlement Agreements, HSBC Remains Liable

The December 11, 2012 Settlements do in any way release HSBC's liability for the violations of the BSA, IEEPA and TWEA set forth herein for the following reasons.

First, the illegal conduct that Stern complains of herein is not addressed by the Settlement. Each of the five Settlement Agreements entered into by HSBC on December 11, 2012 contains its own factual findings and release language. **Each of those Agreements specifically refers to HSBC conduct that occurred in 2010 or prior, and not during the time period Stern worked at HSBC and independently observed illegal conduct as reported herein.** The release language in each of those Agreements, in general, only releases HSBC from liability for conduct that (i) was specifically disclosed to the government agencies, (ii) was set forth in factual findings, and/or (iii) occurred during the time period generally discussed in the

---

[7] Attached hereto as Exhibit 7 ( Department of Justice), Exhibit 8 (Federal Reserve), Exhibit 9 (OFAC), Exhibit 10 (OCC) and Exhibit 11 (FinCEN).

factual findings.  In fact, the Department of Justice Settlement Agreement with HSBC specifically states that HSBC may still be prosecuted for knowingly and willfully transmitting or approving the transmission of funds to or from OFAC-designated entities, other than for transactions disclosed and documented to the U.S. (Exhibit 7, pp. 14-15)  Thus, the conduct that Stern complains of, which forms the basis of his allegations herein, is not released in the Settlement.

Second, the Settlements relate to conduct that occurred in 2010 and prior, and not to conduct that Stern complains of which occurred after the date Stern began working at HSBC in December 2010.

Thus, there remain viable claims for HSBC's violations of AML laws and regulations beginning in December 2010 and continuing to the present.

Kal5769683